Good morning. Verna Weisfeld on behalf of Arlene Dugmore, appellant. Even under the tough exacting standards of the AEDPA, there is no evidence under Jackson v. Virginia that a rational jury could find Ms. Dugmore guilty of murder and conspiracy beyond a reasonable doubt. And the Court of Appeals' decision to the contrary was objectively unreasonable and the fair-minded and rational jurors would agree with me and not with the Court of Appeals. The evidence in this case is entirely speculative. We know, for example, that we clearly know that Mr. Dugmore Well, the evidence is circumstantial. I'm sorry? Circumstantial. Well, it's circumstantial, but it's speculative. And so all of the evidence, whether viewed individually or together, viewed in the light most favorable to the prosecution, really doesn't mean anything. It's completely speculative. And I'd be happy to go through the evidence, which is not even that much. I mean, first we're talking about, clearly we have to keep in mind that Mr. Dugmore was clearly killed on the orders of the co-defendant in a drug deal and the hit man and the drug dealers and that sort of thing testified that they didn't know anything about Ms. Dugmore. So what's the evidence connecting her? Is it your claim that Mr. Dugmore was involved in a drug transaction? It's unclear whether he himself was involved. Is it your claim that there is evidence that Mr. Dugmore was involved in a drug transaction or was he killed by people who were also involved in drug transactions? He was killed by people. Then let's be clear about that. There is no evidence whatsoever that Dugmore or his wife were ever in drug transactions or were clients of Mr. Arias. Is that correct? There was no evidence of Mr. Arias. Thank you. That's correct. Let's clean up the prose, all right? Yes. But the evidence that he was killed by Mr. Arias, who was a drug dealer, and by the Well, he was killed by Mr. Herzl. He was the co-defendant. The gunman was Herzl. I'm sorry? The gunman was Herzl, right? Arias didn't pull the trigger. Herzl. No. He was killed by, what is it, Herzl, Villiani, and the other guy's name. Right. But in any event, that was clearly all involved with Herzl killed him. Arias asked him to kill him. But what is the evidence that Ms. Dugmore, Arlene Dugmore, had anything to do with all of that? The prosecution's evidence is, in fact, nothing but speculation. We have a life insurance policy, a life insurance policy that her husband took out after he was killed. Viewing the evidence in the light most favorable to the prosecution, Ms. Dugmore did not apply for that insurance policy. When Mr. Dugmore's family applied for it, the insurance agent said, You are not the primary beneficiary. And they went to Ms. Dugmore, and she got the insurance policy. What's the other evidence of that insurance policy? Years later, she was engaged to be married again, and her fiancé at the time testified that she asked, when he mentioned that he had insurance policy for his young son, she asked, Well, put me on the insurance policy. What's the other evidence of money? Well, first of all, going back, is there any evidence in this case that she asked Mr. Arias or agreed to have her husband killed for this insurance policy? None. What about other evidence of money? It's only speculation. It's only speculation. Is it speculative when Ms. Loveland sees Ms. Dugmore give money to Arias in Arias's bedroom? Is that speculation? Yes, and I'll tell you why. No. Viewing the evidence in the light most favorable to the prosecution, the Court has it right. That's all that happened. When the prosecutor asked Ms. Loveland, how much money was it? What was the reason that Ms. Dugmore gave for giving money to Arias, the drug dealer, in Arias's bedroom? There's no evidence. What was the evidence that she gave as to why she gave the money? She didn't take the stand, did she? Ms. Dugmore did not take the stand. Was there any evidence as to another reason other than the fact that she was paying him off to kill her husband? There was no evidence of that whatsoever. Well, there was no evidence that it was a drug transaction as opposed to something else. Ms. Loveland did not testify that it was a drug transaction. She said, I was in the house. And she did testify that we're all a bunch of drug dealers. She said that Ms. Dugmore and her husband were not drug dealers. And she said, there was a young child in the room. Rudy Arias told me to leave. He didn't want me there. And I saw Ms. Dugmore hand him some money. And the prosecutor said, how much money was it? And she says, I can't tell you that. Then that was it. That's all there is. I mean, they could have been arguing. Yes, there was evidence that she overheard him say that Arlene owed him money. How much money? And for what? Was it for the pizza that they had just bought? And they were arguing over who was paying? There was no evidence in the record whatsoever what this money was for. None. Then on the tape telephone call when Arias was in jail, he calls Ms. Dugmore. And he says, I need some money. Can you help me out? She says, no, I have to call my brother. And he said, well, can you get me the phone number for it? Did he say on the phone, you know, you still owe me a lot of money or all that big favor I did for you? Nothing like that. Nothing like that at all. He said, what do you want me to do, admit it? I'm sorry? He said, what do you want me to do, admit it? My hearing is bad. He said something to the effect of, to her, what do you want me to do, admit it? What does that? Admit what? The pizza delivery? She didn't say anything in response to that. No, she helped him. And she said, I will call my brother and he can talk to you. You know, and that's in fact what happened. She never paid. There was no evidence that she paid him any money in response to that telephone call. No, the problem I have with your analysis of the evidence, the problem I have with it, is that you take each one of these isolated pieces of evidence and argue that it's conjecture or speculation. But I think after a while, it's all circumstantial, but after a while there's so many pieces that the inference can be drawn that she, in fact, was the one who paid Arias to have her husband killed. I disagree. I think if you add it all up together, it still doesn't mean anything. I mean, if you have zero plus zero plus zero plus zero, it still equals zero. Overall, the whole thing is that she had that. But you're not adding up zeros. You're not adding up zeros. You've got some evidence here, some evidence there, some evidence here, some evidence there. You look at the totality of the evidence. That's where the persuasive power comes in. You look at it all together, and then the jury's got to be convinced beyond a reasonable doubt that the person that's accused is guilty. You don't say, well, this is not much, this is weak, this is weak, this is weak, this is weak. That doesn't mean that they all don't add up or couldn't add up to guilt beyond a reasonable doubt. If you have speculative evidence and then you add some more speculative evidence and you add some more speculative evidence, it doesn't make the case any better. Well, you're putting a zero on it, but you have certain things here that you can draw inferences from. But they have to be rational inferences, and they can't be based on conjecture or speculation. For example, if there was evidence in the record that said, I overheard Rudy say that Arlene owed me money for that big favor I did for her. We don't have anything like that. We don't have anything at all like that. And we add in other things like, for example, she didn't want to go on America's Most Wanted. I mean, that's just unbelievable. But you don't want to go on America's Most Wanted. You're concerned that your phone might be tapped. And you may have given or you gave an unspecified amount of money for whatever reason nobody knows and nobody tried to prove. That adds up to murder and conspiracy. To whom did she give the money? To Arias. Who hired Hetzel to kill Doug Moore? Arias. Arias did. What? I mean, is that speculative or circumstantial? No. Not at all. Because we don't know how much money was given to Arias by this. Why would she give him any money? Why not? I mean, the prosecution has to prove that this evidence is – shows guilt beyond a reasonable doubt. If she could have given – I mean, Mr. Arias was the brother-in-law of her own brother. I mean, why not – why give anybody money? Why give money to people on the street that are begging for money? People give – we give money back and forth all the time. There was no evidence in the record that this was a substantial amount of money. Period. And when Loveland was asked by the prosecutor, well, you know, was it a one bill? Was it a – she said, I don't know how much money it was. She says, I don't know. And I mean, that's the thing is there's no evidence in here that anybody overheard anybody or that anybody said that Ms. Dugmore wants her husband killed. That she – nothing like that. Someone overheard Arias say, Dugmore owes me – Arlene owes me money. What? What? What kind of money? Is that for the pizza? I'm sorry? Was that for the pizza when she said, Arias owes me money? Or Arias said, Arlene owes me money? Loveland said that she overheard Arias say, Arlene owes me money. She did not say for what. Why would Arlene owe him money? There was no drug transaction between them. They were not business partners. Why would she owe him money? Well, Ms. Dugmore did not have to prove why she gave money or didn't give money. Thank you. The answer is you don't know. For 20-some years. You know? I mean, every transaction that you – you're supposed to document every transaction that you have with a friend or a relative. And, you know, this is money I gave to you. I mean, like, keep, you know, accounting and books for everything so that you can prove why you gave somebody a dollar. Well, we don't know. It's entirely speculative. And you add up all the evidence in this case, it is still speculative. And it doesn't – the prosecution did not prove it's a case. Where did the $10,000 figure come from? I'm sorry? Where did the $10,000 figure come from? Mr. Ignacio, who was her brother, asked his mother for $10,000. There was no evidence that Arlene had anything to do with that other than passing on this message. And it's still no evidence that this $10,000 was because Arlene wanted Mr. Dugmore killed. Nothing. So just money transactions without more is meaningless. And the other evidence in this case, again, is you can add it all up. It's not like, you know, put a little piece of evidence here, it's a link in the chain of evidence, and it comes up to this compelling case. It did not. It all added up to a big fat zero. You want to save some time. Yes, I do. Thank you very much. May it please the Court, Deputy? Are you related to Matt Byrne? No, Your Honor. Everybody always asks, but I'm from the Downey Byrnes. Where? The Downey Byrnes. That's where I grew up was Downey. You're from the Silk Curtain Byrnes. I'm not related to the judges. But everybody asks me that, though. My brother went to law school with one of them, though, at UC Davis. In any event, Kenneth Byrne, Deputy Attorney General, on behalf of the Respondent and on behalf of the League of Wardens. Did you try the case? No, I didn't, Your Honor. The District Attorney's Office did. When you look at this case as a whole, I would respectfully submit that the evidence is definitely all circumstantial. In this case, there was no written murder contract. The agreement between Petitioner and Arias, whenever it was made, don't know when it was made, but it wasn't captured on film. Typically, the deal was kind of cut, as these things generally are, when nobody else is watching. But in listening to the prior comments of my opposing counsel, it wasn't just that Petitioner gave Arias money in his bedroom when she wasn't involved in drugs. It wasn't just that. It's that he got angry when his girlfriend saw them, and he kicked her out of the bedroom where she slept. It was her bedroom. So it wasn't just the money. It's that he didn't want her to know what was going on. And that's often we don't know how much money there was, is because she had to leave. And it wasn't just that. Maybe Arias didn't want his girlfriend to be jealous about getting money from another woman. Well, that's possible. That's an inference I suppose the jury could have possibly drawn, Your Honor. But the jury in this case, under the rules of Jackson and so on, we view the conviction in light most favorable to the judgment. And I think given that all the evidence was that Arias sold drugs openly and he supplied Lane Loveland, his girlfriend, with drugs, and given the fact that Petitioner wasn't involved in drugs, I think it can be inferred that it was for something else and that it was something nefarious. It could have been he wanted to prevent jealousy, but I think the inference there is for the jury to make. And then talking about the America's Most Wanted situation where the victim's sister, who was frustrated at the last lack of progress as years went on, it wasn't just that the Petitioner didn't want to go on TV. It's that when she thereafter, immediately thereafter, she got off the phone with the victim's sister, it's that she called, the Petitioner called her own mother. And there what's important is she said, I didn't want to say no right away, the FBI might be listening. So it's not just that. What's that other strange thing? She seemed to have an awareness that her phone might be tapped, which could support an inference that she had a consciousness of guilt. Yet she still talked on the phone that she thought was tapped. That's true, Your Honor. She wasn't very smart. I mean, she thought the phone might be tapped, yet she made a statement which I find is pretty incriminating. I can't explain why people do that. I had a case one time where a defendant robbed a liquor store and he left his wallet on the counter. I mean, criminals do dumb things sometimes. I can't necessarily speak for them. So the trial court and our magistrate judge gave this March money big note differing weights in the consideration. What's your analysis of that note and how it bears in this case? Your Honor, I thought it was a pretty compelling piece of evidence. The DA argued that in his closing. The state superior court judge found that to be the, quote-unquote, Rosetta Stone of the case. And as you're right, the district court judge or the magistrate judge totally disregarded it. I think it's a pretty compelling piece of evidence. And, yes, it's true. The reason the district court disregarded it was there was no showing that the petitioner knew that she would receive half a million dollars in life insurance in March, which, by coincidence, is when she got it. Her husband was murdered on Valentine's Day, February 14th, 1992, if I'm correct. And she received the money, the life insurance, about a month later. So how did she know the prior year that the murder would take place in February? Well, she's the one that caused the murder to take place. She knew when it was going to take place. Well, did she really? Because didn't they try to do this murder earlier a couple times and it didn't kind of work out? Yes, Your Honor, but that took place over a very brief period of time. Hetzel testified that he first was contacted in the early part of 1993. The murder happened February 14th. So it took place over a very short period of time. But it's an amazing coincidence, I think, that the defendant wrote, March, money big. Coincidentally, she got half a million dollars in life insurance in March of 1993. Could that have been a coincidence? Sure. Could she have possibly meant something else? You know, maybe she was going to get the piece of money back from Arias. I don't know. But I think it's a reasonable inference that, by coincidence, when you get half a million dollars in March and when previously you wrote, March, money big, I think that's pretty damning. What was the evidence that the note was written the year before? Yes, Your Honor, it was dated July of 1992, the same year that the life insurance was doubled on Gary Dugmore. So, you know, and again, my opposing counsel will probably get up in a minute and say this is conjecture, but I think what happened is I think the defendant planned it out, I think the life insurance was doubled, and I think she wanted to wait about six months so it didn't look suspicious. That's what I think, and I think that's why she didn't apply for it herself, because she thought that would invoke too much suspicion. So I think in some ways she was pretty smart. And after all, she almost got away with it. The trail went cold, and it was seven years later, only because the victim's sister pushed this with the police. That's the only reason she got caught. But I think she planned it out, and I think in many ways she was cagey, and in some ways she was not so smart. The other thing I wanted to mention regarding the phone call, after Arias was arrested, it wasn't just that she gave him money. It was, as there was a question before, when Arias first called, and if I could indulge the court and just read a little bit here, Arias calls the petitioner and says, hey, check it out, I need some money, I need some help. And the petitioner says, uh-huh. And Arias says, you think you can help me? I don't have what, what are you talking about? And the first statement he made was, it's Rudy. And she said, Rudy who? But here's the important part. And this is where Arias kind of ups the ante a little bit. You know, what am I supposed to do, admit it? And bang, after that, the petitioner's right on board about getting him what he wants. You know, where are you at? I'll hook my brother Ben up, he'll take care of what you need. So it wasn't just the fact that she gave him money. It was the fact that she did it after he mentioned, what am I supposed to do, admit it? So I think that, again, does that by itself prove anything? No, it doesn't. It's yet another piece of circumstantial evidence in this, what I have to say I think is a pretty overwhelming circumstantial case. And when you look at the Jones v. Wood case, the decision from this court which I cited in my brief, and in the district court as well, and the facts of Jones v. Wood are totally different from this other than involved a murder of a spouse, a wife by the husband in that case. But there the issue was, here you have a murderer, Jones v. Wood, we don't really know what happened. You know, the defendant had some wounds that possibly were defensive wounds, maybe wounds he suffered when he was stabbing the victim, we don't know. But the point is, this court said, to the extent that there are conflicting inferences can be drawn, that's a function for the jury. In Onhabia's review, under AEDPA, that review is doubly deferential. So the issue isn't whether we standing here in court would vote to convict the petitioner of murder and conspiracy. The issue wasn't whether if this case was the United States v. Dugmore, and under Jackson's review, this conviction should be affirmed. It's under AEDPA whether the California Court of Appeals' reasoned, very careful decision is entitled to deference. The Supreme Court has said, as a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that a state court's ruling was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement. And in this case, when you read the opinion of the California Court of Appeals, they said, after careful consideration, after careful review of the evidence in this case, we think that there's enough to survive Jackson's review. And I think that when the double deference under AEDPA is paid to that evidence, I think it's clear that the conviction has to be affirmed. Could you explain double deference to me? Yes, Your Honor. If this case was the United States v. Dugmore, under Jackson v. Virginia, light and most favorable to the judgment, conflicting inferences would be drawn by the judgment, in favor of the judgment, to the extent that some piece of evidence is ambiguous, the court has to assume in favor of the judgment. And then I think when you get into double deference, I can't really quantify it mathematically, and I think that's a problem in the case law, but it means even more deference to the state court, which was the first level. I think Justice Thomas first started using that in the cases dealing with Strickland on habeas, Strickland claims on habeas. He started talking about double deference. Yes, Your Honor. I think that's where it comes from, horizons v. nulls. And this Court used that phrase in Wyneach v. Allen, a sufficiency case that opposing counsel relies on. There this Court said that sufficiency rule is doubly deferential as well. So the answer to the Court's question, all I can say is it's even more deferential than direct appellate review of the sufficiency of a conviction under Jackson v. Virginia. It's kind of odd. I mean, I'm not sure it's the best term to describe it. You are viewing it first through the lens of ADPA, and then through the lens of Jackson or vice versa. I think that's what you mean. I'm not going to criticize this Court's language in Wyneach v. Allen, Your Honor. Well, it's okay. Other people do. Well, I try to be polite when I argue. Okay. So in any event, the point I just wanted to make was that, again, that when you look at individual pieces of evidence, there's no smoking gun in this case, and there's no one fact that proves guilt beyond a reasonable doubt. You have to take the mosaic altogether. And in my opinion personally, I think the most compelling piece of argument is I didn't want to say no right away because the FBI might be listening. And, you know, sure, maybe the reason she didn't want to go on TV is she was camera shy. She was trying to get past the murder, trying to put her life behind her. And by the way, you know, I think I have to say with all due respect, I think she was able to put the murder behind her three months later when she bought a house in Laguna Hills with the life insurance money and moved in with her new boyfriend. So I think she was able to move past the murder pretty quickly. Can I ask you something? In California, when it's life without the possibility of parole, is that really without the possibility of parole? Yes. So that under no circumstances. Say she were to become ill while she's serving this life sentence. Well, she could apply for compassionate release. Compassionate release. And as the court may know, one of the Manson defendants did that. That was denied. And I can't remember if it was Kringwinkle, but it was the Manson co-defendant who died in prison recently with cancer. Is compassionate release the only exception to that? The government can grant clemency, Your Honor. So those are the two? I'm just curious. As far as I know. As far as I know. When a defendant in California is sentenced to life without the possibility of parole, unless some court, whether a state court or federal court, finds insufficient evidence of the special circumstance, which, by the way, is the issue raised by Arias in the case I'm handling right now in the district court where the report and recommendation was filed last week to deny relief. So that case is going to end up up here also? I'm sorry, Your Honor? Arias' case is making its way to us too? Eventually. I'll be sure to note the notice of related case when I file a brief in that case, if he can get a COA. Anyway, in all candor, in all honesty, his case was not very compelling. The only thing he challenged was the sufficiency of the financial gain special circumstance. And he had an issue about ineffective assistance of counsel at sentencing. In the case laws, you don't have effective assistance of counseling at sentencing. So, you know, it's possible he won't get his certificate of appealability, Your Honor. But eventually I anticipate being there. What's his sentence? What is he serving? Life without parole. But to finish the point I was going to make, unless some court finds insufficient evidence of the special circumstance, neither defendant will ever come up for parole before the parole board in prison like defendants do. So unless the governor would grant clemency or a compassionate release, they will spend the rest of their life in prison. So in closing, I would just like to say that I think this is a compelling case. In Jones v. Wood, this court upheld on sufficiency review a circumstantial evidence case where the evidence was, quote, unquote, relatively weak. And again, the facts of that case are different, so I'm not going to try to rely on them. But I would say that in my opinion, I think this is a pretty compelling case of circumstantial evidence. There was no reason why this fellow would have been killed by these people if it wasn't for the fact that his wife hired him to kill him. Are you allowed to say, in my opinion, I believe, or should you say, I believe the evidence demonstrates that this is a compelling case? I think that would be better advocacy, Your Honor. Yeah, I don't think you're supposed to. OK. If I could, if I can. The weight of the attorney general's office into your opinion. Well, I'll certainly be glad to retract my comments. Thank you, Your Honor. But I would submit that the evidence in this case was very compelling, and the jury had no problem convicting the defendant. The California Court of Appeal had no problem upholding the conviction, and the district court properly denied relief. Now, Hetzel, Martinez, and, I guess, Balani. Hetzel and Martinez, they pled guilty? I know that Hetzel did. I don't remember that Martinez was charged. Was Balani charged? I don't believe he was, and I don't know why not. I do know that Hetzel pleaded guilty and is in prison. Did any of those guys come up with any evidence that points to this defendant? To the petitioner? Yeah. No, they didn't know him. They didn't know her. The petitioner went exclusively through Arias, and Arias went exclusively to these guys. The actual killers, Hetzel, Balani, and the other guys, they had no contact with the petitioner. What happened to Arias? He got life without parole. So unless the court has any further questions, I will be happy to, I have 21 seconds, so I timed it out pretty well here. I'll be happy to. No, you're over. I'm 25 seconds over? You're over. Well, thank you very much. Unless the court has questions, I'll submit. Thank you. Still, one can only guess what any of this evidence means, and that's the whole point. It's all very speculative. But as I was listening to counsel's argument, and he thought it was compelling that on the tape-recorded phone call when Arias was in jail, he said, what am I supposed to do, admit it? But look at this. Here's a tape-recorded call that was set up by the police, and Arias, did he say, are we supposed to admit it? Did he say, you owe me money? No, he didn't say that at all. He said, what am I supposed to do, and can you loan me some money? And she said, no, you'll have to talk to my brother. All the other evidence, one can only guess at what it means. And adding it all up together, it still is speculative. And for that reason, it's insufficient. And her brother was Ignacio, right? Her brother was Ignacio? Yes, correct. Ignacio was the man who asked his mother for $10,000. That's correct, not Arias. Any other questions? No, fine. Thank you very much. Thank you, Your Honor. Interesting morning, and you just bring it up here, the paper, yeah. And so we'll now recess until 9.30 tomorrow morning. I'll rise and recess until 9.30 tomorrow morning.  Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor.
judges: Pregerson, Wardlaw, Bea